UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALONZO CHAPMAN,

      Plaintiff,

  v.          Case No. 15-CV-14

MILWAUKEE COUNTY,

      Defendant.

# DECISION AND ORDER

## I. Facts and Procedural History

Alonzo Chapman is a 53-year-old African American male who has worked at the General Mitchell International Airport (GMIA) fire department as an Assistant Chief since 2012. (ECF No. 34, ¶ 1.) Chapman was hired by the department's Chief, Paul Menches, as one of five assistant chiefs. (ECF No. 34, ¶¶ 11-12.) Menches reported to Terry Blue, Deputy Director of Airport Operations and Maintenance. (ECF No. 34, ¶ 6.) Of the other four assistant chiefs hired by Menches, one was African American and the other three were Caucasian. (ECF No. 34 at ¶ 11.)

The GMIA fire department has a quasi-paramilitary structure. As such, the employees are expected to follow a chain of command, to be respectful to their

superiors, and to follow orders. (ECF No. 34, ¶¶ 7.) The Fire Chief and Assistant Chiefs are non-union employees (ECF No. 34, ¶ 9), while the firefighters are members of a union and governed by a collective bargaining agreement. (ECF No. 34, ¶ 10.)

Each of the five assistant chiefs were assigned to handle various administrative duties, either as the primary assistant chief in charge of the duty or as an alternate. Chapman had primary responsibility on Public Education and Facility and Maintenance. He was an alternate on Policy, Operating Standards and Proposals, Safety and Health, Emergency Medical, and Equipment/Apparatus. (ECF No. 34, ¶ 15.)

Menches appointed Chapman as his administrative chief of staff shortly after his hire. (ECF No. 34, ¶ 18.) The administrative chief of staff was the "right hand" of Menches and would fill in for him if he was away. (Id.) Part of the reason for assigning Chapman as administrative chief of staff was to groom him to succeed Menches when Menches left in five years. (ECF No. 34, ¶ 19.)

In February 2013 the GMIA fire department sought to hire two or three additional firefighters. (ECF No. 34, ¶ 21.) In such a situation, an evaluation panel reviews candidates and provides a recommendation to Menches, who makes the hiring decision. (ECF No. 34, ¶ 24.) Menches would normally serve as the chair of the evaluation panel. (ECF No. 34, ¶ 22.) However, to give Chapman experience, Menches designated Chapman as the chair of the panel. (ECF No. 34, ¶¶ 21, 23.)

The evaluation panel interviewed between six and eight individuals. (ECF No. 34, ¶ 25.) A woman, Shannon Rohde, was one of the top two candidates. (*Id.*) There was some discussion by two members of the panel, assistant chiefs Kevin Doyne and Scott Wisnewski, about the logistics related to hiring another female firefighter given that the department's sleeping accommodations for women might not be sufficient to accommodate an additional woman. (ECF No. 34, ¶ 26.) Chapman and another assistant chief, Vernon Easley (also African-American), raised concerns about this line of discussion by the other members of the panel. (ECF No. 34, ¶ 28.) Menches decided to hire Rohde. (ECF No. 34, ¶ 32.)

During his time as an assistant chief under Menches, Chapman was admittedly repeatedly insubordinate. Although Menches welcomed feedback from his assistant chiefs, he expected that, once he made a final decision, his subordinates would not question it. (ECF No. 34, ¶ 36.) Nevertheless, Chapman "constantly challenged" Menches's decisions. (ECF No. 34, ¶ 37; *see also* ECF No. 34, ¶¶ 38, 39.) Blue believed that Chapman was "blatantly disrespectful very publicly" toward Menches. (*Id.*) Chapman's philosophy was that he needed to take Menches "down a couple of pegs…for the good of the organization…." (*Id.*) In an email to Menches dated March 6, 2013, on which he copied the other assistant chiefs, after expressing his disagreement with certain decisions made by Menches, Chapman admitted, "I fully understand that this may provide just cause for my dismissal[.]" (ECF No. 34, ¶ 38.)

3

Chapman was also "blatantly disrespectful in several emails" that he sent to Menches and other members of the command staff. (ECF No. 34, ¶¶ 41-44.) Indeed, Chapman admits that the emails to Menches were inappropriate and that he had devolved into personal attacks against his superior. (ECF No. 34, ¶ 45.) Chapman also failed to follow certain orders from Menches (ECF No. 34, ¶ 46), parked in the clearly-marked parking spot reserved for Menches after being directed not to do so (ECF No. 34, ¶ 48), and disrespectfully referred to Menches by his first name rather than using his title (despite referring to all other command staff by their professional designations) (ECF No. 34, ¶ 49).

On March 28, 2013, Chapman failed to promptly respond to a pilot who reported that a warning light indicated there was a fire in the luggage compartment of his plane landing at GMIA. (ECF No. 34, ¶¶ 50-52.) Without waiting for Chapman's instructions or approval, firefighter Wisnewski (no longer an assistant chief) acted to investigate the baggage compartment and confirm there was no fire. (ECF No. 34, ¶¶ 54-55.) The same day of the incident Menches directed that Wisnewski receive a written counseling regarding the chain of command violation. (ECF No. 34, ¶ 58.)

Apparently unaware that Menches had directed that Wisnewski be disciplined, Chapman felt that Menches was going easy on Wisnewski because he was the president of the firefighters union. (ECF No. 34, ¶ 58.) The following day Chapman issued a memorandum to Menches and Blue, resigning his position as administrative chief of

4

staff and accusing Menches of having engaged in "illegal and immoral acts." (ECF No. 34, ¶ 59.) Blue requested that Chapman either support or retract his allegations about Menches. (ECF No. 34, ¶ 62.) Chapman was aware that if he did not substantiate his allegations or retract them he would be disciplined. (ECF No. 34, ¶ 63.) Nevertheless, he refused to retract his allegations against Menches or provide any substantiation for them. (ECF No. 34, ¶ 63.)

While Blue was still deciding how to address Chapman's unfounded allegations, on April 23, 2013, Menches attempted to discuss with Chapman his recent performance problems and to issue Chapman a "written counseling" regarding those performance issues. (ECF No. 34, ¶ 65.) The "conversation deteriorated" and Chapman left Menches's office, contrary to Menches's direction and orders. (ECF No. 34, ¶ 66.) When Menches followed Chapman to Chapman's office, the conversation continued to escalate, with "Chapman inappropriately mentioning Chief Menches'[s] wife in the conversation." (ECF No. 34, ¶ 67.) Chapman called the Sheriff's Department, which determined that there was no basis for taking any action. (ECF No. 34, ¶¶ 68-69.)

Blue placed Chapman on paid administrative leave while he investigated Chapman's conduct. (ECF No. 34, ¶ 70.) A hearing was held on May 2, 2013, with Sean Moore, Milwaukee County's Human Resources representative for GMIA, acting as the hearing officer. (ECF No. 34, ¶ 71.) Based upon Chapman's numerous incidents of misconduct, his elevated position within the fire department, and his insubordination

towards Menches, Blue recommended that Chapman be suspended for 10 days. (ECF No. 34, ¶ 74.) Blue's recommendation was accepted by Moore. (ECF No. 34, ¶ 74.)

In this lawsuit Chapman alleges that he was discriminated against due to his race and retaliated against for opposing the consideration of Rohde's gender as a hiring factor. All parties have consented to this court's jurisdiction. (ECF Nos. 3, 5.) Defendant Milwaukee County has moved for summary judgment on Chapman's claims. The motion is now ready for resolution.

**Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable finder of fact could accept the non-moving party's position and return a verdict in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from that evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008)); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001). The "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (quoting *Payne v.*

*Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690-91 (7th Cir. 2010)).

## II. Analysis

### A. Title VII Retaliation

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee because that employee opposed a practice forbidden by Title VII. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 441 (7th Cir. 2010). To prove retaliation, a plaintiff must show: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the two. *Id.* (quoting *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751-52 (7th Cir. 2002)).

#### 1. Statutorily protected activity

Chapman alleges that he engaged in statutorily protected activity when he objected to the discussion initiated by assistant chiefs Wisnewski and Doyne regarding any consideration of Rohde's gender as a factor in deciding whether to hire her. (ECF No. 32 at 7.) Milwaukee County asserts that "[n]o rational argument can be made that Mr. Chapman had a reasonable, good faith belief that discussions by non-decision

makers about the logistics of how to fit an additional female into the sleeping quarters constituted sex discrimination under Title VII." (ECF No. 29 at 10-11.) It emphasizes that Chapman must show that he had an objective good faith, reasonable basis for believing that discrimination occurred; a mere subjective good faith belief is insufficient. (ECF No. 35 at 4.)

One objectively reasonable understanding of the discussion by Wisnewski and Doyne is that they sought to dissuade Menches from hiring Rohde by pointing out that the department might not have sufficient accommodations for an additional woman. A reasonable finder of fact could conclude that Chapman reasonably believed such consideration of gender in a hiring decision violated Title VII, and as a result he objected to the discussion of accommodations by the evaluation panel before any hiring decision was made. Thus, the court finds that Chapman has identified facts that would allow a jury to conclude that he engaged in statutorily protected activity.

**2. Adverse employment action**

Chapman asserts that his "duties of directing evaluation panels, purchasing equipment and maintaining the facility were stripped from him directly as a result of his speaking out regarding Shannon Rohde." He argues that relieving him of certain administrative duties and reducing others are actions that would have a tendency to deter an employee in his position from complaining about discrimination. (ECF No. 32 at 8.) Milwaukee County contends that the changes in responsibilities to which

8

Chapman points were nothing more than "minor alterations of secondary job duties" which do not rise to the level of materially adverse employment action necessary to support a claim of Title VII retaliation. (ECF No. 29 at 12-13.)

"In the retaliation context, determining whether an action is materially adverse means inquiring whether it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "[P]etty slights, minor annoyances, and bad manners" are not materially adverse employment actions. *Id.* "An employee must suffer something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* at 918-19 (quoting *Hobbs v. City of Chi.*, 573 F.3d 454, 463-64 (7th Cir. 2009)). Although an "adverse employment action" is defined broadly, "not everything that makes an employee unhappy is an actionable adverse action." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007).

The Court of Appeals for the Seventh Circuit has repeatedly found that minor alterations of job responsibilities, even when regarded as personally humiliating, are not enough to establish an adverse employment action. *See, e.g.*, *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (finding relocation to an office across the street and an increase in difficult work are not materially adverse employment actions, even when it led to decreased performance reviews, thus rendering the employee ineligible for a bonus); *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.

1993) (finding that a change in title and responsibilities from assistant vice-president and manager of one branch of a bank to a loan officer position at a different branch did not by itself constitute an adverse employment action); *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir. 1989) (finding principal's reassignment whereby she would act as co-principal of two new schools was not adverse employment action).

Chapman alleges that he was not asked to chair any subsequent hiring evaluation panels and that he no longer had the responsibilities of purchasing equipment or maintaining the facility. (ECF No. 32 at 8.) However, overseeing evaluation panels was not a responsibility of the assistant chiefs. (ECF No. 34, ¶ 15.) Menches typically chaired those panels. The only reason Chapman was given the opportunity to chair the panel that ultimately resulted in Rohde being offered a job was because Menches was grooming Chapman as his successor. Once Chapman quit as administrative chief of staff (and thus was no longer in-line to succeed Menches), there was no longer any reason to have him chair future evaluation panels.

Moreover, chairing the evaluation panel was, at best, a tangential and minor aspect of Chapman's job responsibilities. Chapman thereafter maintained the title of assistant fire chief, maintained all the same pay and benefits, and there is no evidence that his core job responsibilities of supervising firefighters were altered. Consequently, the failure to allow Chapman to chair subsequent evaluation panels cannot be regarded as an adverse employment action.

As for purchasing equipment, that was never one of Chapman's primary responsibilities. It was an administrative duty that had been assigned to a different assistant chief. (ECF No. 34, ¶ 95.) Regardless of what informal involvement Chapman might have had in purchasing equipment, the removal of such tangential responsibilities cannot be regarded as an adverse employment action.

Chapman, however, was assigned primary responsibility for facility and maintenance. (ECF No. 34, ¶¶ 15, 90, 99.) And after the flare up over Rohde he remained primarily responsible for facility and maintenance matters. (ECF No. 34, ¶ 99.) The only change was that "while he could still write work orders he was no longer involved in ordering or organizing the items or supplies." (ECF No. 34, ¶ 99.) Absent a more thorough explanation from Chapman of how that change impacted his job, the court cannot conclude that such a seemingly minor alteration of one subset of Chapman's responsibilities was an adverse employment action.

### 3. Causal link between alleged protected activity and adverse action

Chapman sets forth three arguments that he contends establish a causal connection between his alleged oppositional activity and the alleged adverse employment action. First, he asserts that his removal from the next evaluation panel despite the fact that he "was knowledgeable and had acquired experience in this area" establishes that the removal was a result of his having opposed the discussion about Rohde's gender. Second, he argues that the fact that his responsibilities "regarding

11

purchasing and maintenance of the facility were reduced, provide further evidence of adverse action that was the result of his opposition." Finally, he argues "[i]t is significant that no other Assistant Chiefs had their duties reduced." (ECF No. 32 at 9-10.)

Milwaukee County argues that no reasonable jury could find a causal link between Chapman's complaint in February 2013 and the removal of some administrative job duties around August 2013. In the interim, much evidence exists of Chapman engaging in disrespectful and even insubordinate acts, including accusing Menches of immoral and illegal actions. The county also points to the absence of any statements attributable to Menches that suggest that the alteration of administrative job duties was motivated by Chapman's complaint regarding the evaluation panel. (ECF No. 20 at 16-18.)

It is undisputed that Chapman was designated to serve as the chair of the evaluation panel because he was the administrative chief of staff and being groomed to succeed Menches. (ECF No. 34, ¶ 23.) It is further undisputed that Menches generally served as the chair of the evaluation panel. (ECF No. 34, ¶¶ 22, 92.) With Chapman no longer in line to be Menches's successor (because he had resigned as Menches's chief of staff), there was no further need to provide Chapman with experience handling responsibilities reserved for the chief. (ECF No. 34, ¶ 93.) There is no evidence supporting the conclusion that Chapman's oppositional activity, rather than his

resignation as administrative chief of staff (or his various other unprofessional and insubordinate conduct (ECF No. 34, ¶¶ 37-49)), was the cause of his not being called upon to chair any subsequent evaluation panel. Indeed, Easley (also African American) served on subsequent evaluation panels even though Chapman acknowledges that he, too, engaged in the same oppositional activity as Chapman. (ECF No. 34, ¶ 94.)

Chapman's second argument, that the fact that his responsibilities "regarding purchasing and maintenance of the facility were reduced, provide further evidence of adverse action that was the result of his opposition," is an empty non sequitur. The fact that his job duties were allegedly altered offers no indication of the reason for the change.

And his third reason, that no other assistant chiefs had their duties reduced, is unsupported by any citation to the record. Even if Chapman could show that none of the other assistant chiefs had any of their responsibilities reduced, there is no evidence that any other assistant chief was similarly repeatedly unprofessional and insubordinate. If anything, the fact that Easley, also African-American and also a vocal opponent of the discussion of Rohde's gender, did not have any of his job responsibilities altered (as Chapman concedes) suggests that Chapman's opposition to the gender-based discussion of Rohde had nothing to do with any subsequent reduction in his job responsibilities.

13

Therefore, the court finds that Milwaukee County is entitled to summary judgment as to Chapman's Title VII retaliation claim. The changes in job responsibilities that Chapman identifies were too insignificant to constitute adverse employment actions. Moreover, there is no evidence that could support a finding that these changes in responsibilities were the result of his alleged opposition to perceived sexual discrimination.

### B. Section 1981 Discrimination

Chapman contends that the 10-day suspension he received was racially motivated in violation of 42 U.S.C. § 1981. (ECF No. 32 at 10.) More specifically, he appears to argue not so much that Milwaukee County was not entitled to discipline him but rather that he received an especially harsh punishment due to his race.

As with a discrimination claim under Title VII, to prove a claim of discrimination under § 1981, a plaintiff must generally make a prima facie case that: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; (4) and similarly situated employees who were not members of the protected class were treated more favorably. *Chaib v. GEO Grp., Inc.*, 819 F.3d 337 (7th Cir. 2016); *see also Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016). If the plaintiff can meet these elements of a prima facie case, the burden shifts to the employer to show that it had a legitimate, non-discriminatory reason for its action. *Id.* If the

employer meets its burden, then the burden shifts back to the employee to show that the reasons proffered by the employer are a mere pretext for discrimination. *Id.*

It is undisputed that Chapman is a member of a protected class and that the suspension without pay was an adverse employment action. The only issues are whether the evidence demonstrates that Chapman was meeting Milwaukee County's legitimate job expectations and whether similarly situated employees who were not members of the protected class were treated more favorably.

Chapman alleges that he "was performing all of the duties that were assigned to him[,]" although he does not cite to anything in the record that supports that proposition. He further states that "there is nothing in the record that supports the contention that he was not meeting GMIA's legitimate expectations with respect to his actual job performance." And he says that the matters to which Milwaukee County points that allegedly establish insubordination and disrespect on Chapman's part "had not previously been brought to his attention[]" or "raised in any prior evaluation of the Plaintiff." (ECF No. 32 at 11.)

Milwaukee County responds by pointing out that Chapman does not dispute that he directed insubordinate and disrespectful email communications to Menches. And it argues that it is legally irrelevant whether Chapman's insubordination was addressed with him before his suspension. Requiring prior notice would prohibit an employer from disciplining an employee the first time he engaged in misconduct, and

15

Chapman fails to cite any authority that that is the law. In any event, any alleged lack of prior notice to Chapman of problems in his performance does not mean he was performing up to expectations.

Contrary to what Chapman contends, his history of misconduct is extensive. He refused to withdraw allegations that Menches had engaged in "illegal and immoral" conduct despite admitting that the only basis for his allegations turned out to be untrue. (ECF No. 34, ¶ 63.) Chapman was aware that if he did not substantiate his allegations or retract them he would be disciplined. (ECF No. 34, ¶ 63.) The ultimate incident that led to Chapman's suspension is undisputed.

Weeks before this final incident, Chapman acknowledged that his general insubordination and disrespect for Menches "may provide just cause for [his] dismissal[.]" (ECF No. 34, ¶ 38.) In short, Chapman has failed to demonstrate that he was meeting Milwaukee County's legitimate job expectations.

Even if Chapman had established that he was meeting the county's legitimate job expectations, he would have to prove that similarly situated employees who were not members of the protected class were treated more favorably. "In disciplinary cases, those cases in which the plaintiff claims he or she was disciplined more harshly than another employee based on a prohibited reason, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications and conduct." *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005). Normally, this requires the plaintiff to point to

another employee who did not share the plaintiff's protected status but who had the same supervisor, was subject to the same standards, and "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 1049-50 (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)).

In support of his claim Chapman offers two sentences, neither of which are supported by a citation to the record:

> The Plaintiff points not only to the incidents involving Doyne and Erdmann (both of whom are white) that did not result in suspensions, but the fact that suspension has been very rarely used as discipline for any employees. The Plaintiff testified that in other instances where white employees violated policies or procedures, they typically received verbal warnings or some form of progressive discipline.

(ECF No. 32 at 11.) Looking past the absence of citations in his brief and to Chapman's proposed findings of fact for support for his claim, the court identifies one relevant paragraph. It states:

> AC Chapman testified that there have been incidents involving non-black employees at GMIA who received more favorable treatment than he did with respect to discipline. Chapman Dep. p. 171. There have been repeat offenders which have not resulted in suspensions. The only two suspension (sic) were a 3-day suspension for a firefighter who disobeyed a direct order from the Chief at that time regarding taking time off from work during a manpower shortage, and a 5-day suspension of Chief Menches as a result of a DUI. Chapman Dep. p. 172-173.

(ECF No. 36, ¶ 20.)

As Milwaukee County notes in its response to this proposed fact, the assertion that there had been "repeat offenders" was unsupported by any citation to the record as required by Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure. Although Chapman testified that "[t]here have been sometimes repeat offenders, from my understanding," he offered no further details or other support for such a claim. (ECF No. 30-1 at 45.)

Three of the four instances Chapman cites as alleged examples where white employees were not disciplined as severely as was Chapman involved firefighters, who are subordinate to the assistant chiefs. Two of those incidents involved minor traffic accidents where neither firefighter was doing anything improper. (ECF No. 34, ¶¶ 81-82.) Chapman acknowledged that his insubordination was more serious than either of these traffic accidents. (ECF No. 34, ¶¶ 81-82.) The other instance involved a firefighter who disregarded a directive from Menches about taking time off and was suspended for three days. (ECF No. 36, ¶ 20.) Although this factual assertion is supported only by Chapman's own speculative testimony, the court accepts the assertion for purposes of summary judgment.

Firefighters are not similarly situated to Chapman, who was an assistant chief. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) ("It cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the Chief's immediate advisors, who are held to a

18
Case 2:15-cv-00014-WED   Filed 08/16/16   Page 18 of 20   Document 37

higher level of professionalism and who are expected to set the standard of conduct for the department."); *see also Spath v. Hayes Wheels International-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[T]he plaintiff must show that the 'comparables' are similarly situated in all respects."). Moreover, the traffic accidents were minor incidents, not the fault of the firefighters involved, and in no way comparable to the misconduct for which Chapman was disciplined.

The two matters that resulted in suspensions were also dissimilar. In addition to being a subordinate, there is no evidence that the firefighter who was suspended for taking days off had a history of repeated insubordinate misconduct as did Chapman.

The only instance of a supervisor being disciplined was when Menches was suspended for five days following an off-duty arrest for drunk driving. There is no evidence that Menches had a misconduct history of any kind, let alone one similar to Chapman's. Moreover, Menches's misconduct occurred off-duty and was not a violation of a County work rule. (ECF No. 34, ¶ 86.) Thus, Menches was not similarly situated to Chapman.

Consequently, the court finds that Chapman has also failed to demonstrate that similarly situated employees who were not members of the protected class were treated more favorably than he was. Chapman has failed to establish a prima facie case, and Milwaukee County is entitled to summary judgment regarding his § 1981 claim.

Additionally and alternatively, even if the court were to find that Chapman established a prima facie case, the burden would shift to Milwaukee County to demonstrate a legitimate, non-discriminatory reason for its action. As discussed above, it has readily done so. As such, Chapman must demonstrate that Milwaukee County's proffered reasons were merely pretexts for discrimination. He has made no effort to do so. Chapman's arguments go no further than attempting to establish a prima facie case.

The court has no basis for concluding that Milwaukee County's proffered reasons for suspending Chapman for 10 days were untrue. In any event, the court is not a "super-personnel department" tasked with assessing the propriety of every personnel decision. *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). Chapman had a lengthy history of unprofessional and insubordinate conduct. Given his elevated status in the organization, it is entirely reasonable to expect that he would be held to a high standard of professionalism. In short, there is no hint in the record that Chapman's race had any impact upon Milwaukee County's decision to suspend him for 10 days.

**IT IS THEREFORE ORDERED** that Milwaukee County's motion for summary judgment is granted. Chapman's complaint and this action are dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of August, 2016.

*William E. Duffin*
WILLIAM E. DUFFIN
U.S. Magistrate Judge